### DEFECT IN BOWLING ALLEY CAUSES INJURY TO PLAYER.

Circuit Court of Cuyahoga County.

THE HUMPHREY COMPANY v. FREDERICK OHLSON.

Decided, June 28, 1910.

*Negligence—Defect in Bowling Alley—Duty of Proprietor to Inspect.*

The proprietor of a bowling alley impliedly warrants that it is safe for the purpose intended, and is therefore under a continuing duty of inspection to see that it is safe, and if he neglects this duty the question of his knowledge or ignorance of a defect which renders it unsafe is immaterial.

*Smith, Taft & Arter,* for plaintiff.
*Fred. Desberg,* contra.

MARVIN, J.; WINCH, J., and HENRY, J., concur.

The relation of the parties to each other here is the reverse of their relation in the court of common pleas. The terms plaintiff and defendant, as used in this opinion, refer to the parties as they stood in the original action.

The facts are that the defendant is a corporation conducting a place of amusement near the city of Cleveland, known as Euclid Beach Park; that the diversions offered to patrons thereof is that of bowling on a ten pin alley; that on the evening of September 16, 1907, the plaintiff, with his wife and other friends, were at said Euclid Beach Park and having paid for the privilege of doing so, were engaged in bowling at this alley; that when the plaintiff ran forward with a ball to bowl, the heel of his shoe caught on a nail; he was thrown down and his arm broken. His suit was brought to recover damages for this injury. A verdict for $500 was rendered in his favor and judgment was entered

upon that verdict, to reverse which judgment the present proceeding is prosecuted.

It is urged that there was error to the prejudice of the defendant in the trial for which this judgment should be reversed.

First, it is urged that the court erred as shown on page 130 of the bill of exceptions, in excluding evidence offered by plaintiff in error.

D. S. Humphrey, the president of the defendant corporation, was upon the stand and was asked this question:

"Q.   Can you tell us, Mr. Humphrey, how many square feet of floor space there are at Euclid Beach Park?"

An objection to this on the part of the plaintiff was sustained by the court.   The answer would have been "I can."

Then this question was asked of the witness:

"Q.  Will you state to the court and the jury how many square feet of floor space over which people walk, you have at Euclid Beach Park?"

Objection to this, made by the plaintiff, was sustained by the court.   The answer would have been, "four hundred thousand square feet."

The only possible bearing that these answers could have had, or could be claimed to have had, upon the issues in this case, would be upon the ground that because of their immense amount of floor space which the defendant had for the use of its patrons, less care would be required from it with respect to any one particular part of such floor space.   This seems to us to be entirely untenable.   A certain degree of care was required on the part of the defendant at its park, and that same degree of care was required at each particular part of the park to which its patrons were invited, and for which they paid, whether the park was large or small, or whether the floor space was great or limited.   There was no error in this ruling of the court.

The only other claim of error in this ruling by the court is, that under the evidence the jury should have returned a verdict for the defendant, and that having returned a verdict the other way, the court should, on motion for a new trial, have sustained such motion; there was a motion for a new trial on this ground.

It is urged that what is properly called the "runway," being the floor space over which the bowlers run before delivering the ball, was floored exactly as the alley itself was floored; that indeed it was but a continuation of the floor of the alley; that this was of hard polished planking, set on edge and fastened together; that the sides of the several planks constituting this flooring were bevelled in such wise that the nails holding them together were driven in at the sides of said planks and would not project above the surface. The testimony of the plaintiff is that he was making the run on this runway, and just as he delivered the ball his foot caught and he was thrown. It is said that just back of this runway was an ordinary floor, not designed for patrons of the alley to run upon to get the momentum with which the ball was to be thrown, and that such running was to be done on the runway proper, and that it must be that the nail, on which the foot of the plaintiff caught, projected from this part of the floor, not designed as a runway and not laid for the purpose of having the patrons run upon it to get the momentum necessary before throwing the ball, and that the plaintiff must have been negligent in running upon a part of the floor not designed for the purpose. The plaintiff says that his way of delivering the ball was to take two running steps and then glide his foot a little way and then deliver the ball, and it was while thus gliding that his shoe caught upon the nail; but he says that the nail was within about four feet of what is called the foul line, which is the line beyond which the bowler must not go in delivering the ball. This is the dividing line between the runway and the alley way proper. The runway was fourteen or fifteen feet in length, and if the plaintiff is right as to the distance of the nail from the foul line, it must have been in the runway.

When the plaintiff fell he says that half his body, or more than that was lying on what is called the gutter, which, as shown by the drawing produced by the defendant, extends alongside of the alley proper and terminates at the foul line, so that there is no gutter by the side of the runway, and if the plaintiff is right about this, he is probably right as to the place where his foot caught, although he is uncertain as to some of the distances mentioned by him.

Notwithstanding the less likelihood of a nail working up from planks put in as those were which formed the runway and the alley (the nails being driven in at the sides), than from the planks which formed the floor just before the runway and alley was reached, we think it by no means impossible or even improbable that a nail may have worked up, and if it had so worked up as to project above the surface of this runway, a proper inspection of this runway would have disclosed that fact to the defendant. We think from the evidence that the jury might well have found that this nail, though when the construction was made, it was driven below the surface of the runway, had worked up and that it had continued to work up without having been again driven back into place, and that this working up must have continued for such a length of time that the defendant by the exercise of proper care would have known of it. It was the business of the defendant to use all reasonable means to make this place of amusement safe. It is the duty on the part of the proprietor of resorts like that of the defendant to use reasonable care in the conduct of such places, as pointed out in Vol. 1, *Thompson on Negligence*, Section 996, in which this language is used:

"Doubtless the true theory is that such persons assume the obligation of exercising reasonable care, and that what will be reasonable care will be a degree of care proportioned to the danger incurred, and to the number of persons who will be subjected to that danger. A good expression of the rule of liability, applicable in such cases, is found in an English case to the effect that the proprietor of such a structure is not a *warrantor or insurer* that it is absolutely safe, but that he impliedly warrants that it is safe for the purpose intended, save only as to those defects which are unseen, unknown and undiscoverable, not only unknown to himself, but undiscoverable by the exercise of any reasonable skill and diligence, or by any ordinary and reasonable means of inquiry and examination. Such being the nature of the obligation, it is obvious that the proprietor of such a building is under a continuing *duty of inspection,* to the end of seeing that it is reasonably safe for the protection of those whom he invites to come into it; and that if he neglects his duty in this respect, so that it becomes unsafe, the question of his *knowledge* or *ignorance* of the defect which renders it unsafe is immaterial."

To the same effect is the case of *Currier* v. *Music Hall Associa-tion,* 135 Mass., 414, the syllabus of which reads:

"The proprietor of a hall to which the public is invited is bound to use ordinary care and diligence to put and keep the hall in a reasonably safe condition for persons attending in pursuance of such invitation; and if he neglects his duty in this respect, so that the hall is in fact unsafe, his knowledge or ignorance of the defect is immaterial."

It is not at all certain that the jury came to a wrong conclusion in finding that the defendant failed to exercise such reasonable care as the law requires, and the result is that the judgment is affirmed.